UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Timothy A. Ward, | ) | Civil Action No. 4:04-22940-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | REPORT AND |
| | ) | RECOMMENDATION |
| City of North Myrtle Beach, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff brings this action alleging employment discrimination based on race when he was terminated from his job. He alleges a cause of action pursuant to the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*,[1] as well as state law claims for outrage and negligence. The matter is before the court[2] on defendant's motion for summary judgment filed September 9, 2005 (Document # 11). Discovery has been completed and the motion is ripe for consideration. A telephonic hearing was held August 9, 2006.

The facts are mostly not disputed. The parties present nearly an identical set of facts. The facts are set out below with a few modifications and additions.

---

[1] By ordered filed August 10, 2006, defendant' motion to amend its answer to assert an after-acquired evidence defense was granted. Defendant discovered the evidence upon deposing plaintiff when plaintiff testified that his employment with two previous employers was terminated as a result of testing positive for cocaine.

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the district judge.

*Facts*

Plaintiff, an African American, was first employed by defendant in 1982 as a recreation leader.   At the time, he was interviewed and hired by Dick Timmerman, who is white and defendant's Recreation Director.

Plaintiff was hired again by defendant in February 1988, as a ground maintenance technician in the recreation department.  A few months later, Timmerman transferred plaintiff to a position as Assistant Athletic Director.  Plaintiff's immediate supervisor was William Edward Oliver.  Between 1998 and 2002, Timmerman approved a number of pay raises and favorable performance evaluations for plaintiff.   Plaintiff received a pay raise each time he was evaluated.

In June 2001, an issue arose regarding plaintiff's use of his city-issued cell phone. Timmerman informed the plaintiff that this was in violation of defendant's policy.  Plaintiff admits that the allegations contained in Timmerman's disciplinary memorandum on the matter are correct. Plaintiff was required to reimburse the defendant $220, and was placed on probation for six months.

In the performance evaluation that followed plaintiff's probation for the cell phone matter, Timmerman championed plaintiff's cause, stating, "Tim has worked very hard for these past 6 months."  (Plaint. Dep. at 88; Exh. 14 to defendant's Memo.)  In a memorandum issued by City Manager John P. Smith following this evaluation, Smith was critical of Timmerman for not including the cell phone issue in the evaluation.  However, Timmerman "persuaded [Smith] to allow the evaluation to stand as submitted", though he cautioned that he "hope[d] this decision does not leave [plaintiff] with the impression that his infraction was not of a very serious nature".  (Plaint. Dep. at 88; Exh. 14 to defendant's memo.).

-2-

In October 2002, plaintiff was suspended for refusing to follow the directive of defendant's Athletic Director Eddie Oliver (Oliver).  Oliver directed plaintiff to tell a contractor of baseball umpires to not use a particular official/umpire because he was African-American.  Plaintiff thought this was unethical and did not like Oliver making him carry out the "bad news" to people because he did not believe it was his responsibility as Assistant Athletic Director.  (Plaintiff Dep. at 80-81). Plaintiff told Oliver he would not carry out the directive.    Plaintiff reported the matter to Timmerman as follows:

> Q: All right.  So you walk into [Timmerman's] office to tell him what happened?
>
> A: Uh-huh.
>
> Q: Now, does he cut you off and I say I don't want to hear–
>
> A: No, he'd sit down.  He listened to what I had to say.
>
> Q: All right.  Tell me what you told him.
>
> A: I told him that – basically what , what I was asked to do and how I felt that it wasn't my – it wasn't my responsibility and I felt like it wasn't ethical for me to do it.  And he explained to me that was my superior supervisor, and whatever he tells me to do then that's what I have to do regardless of whether I feel like it's unethical or not.
>
> Q: Did you specifically tell [Timmerman] that Eddie said I don't want him to use [the black umpire] because he's black?
>
> A: No.
>
> Q: Okay.  Did you ever specifically tell Mr. Timmerman that race was involved; that it was a race issue?
>
> A: I don't recall.

(Plaint. Dep. at 84-85).  In other words, plaintiff reported the matter to Timmerman without ever

telling him the issue involved race. Based on the information presented to Timmerman, plaintiff was suspended for two days. (Plaint. Dep. at 85; Exh. 13 to defendant's memo.). Timmerman advised plaintiff that his conduct "cannot be tolerated and must not occur again." (*Id*.)

Plaintiff received his next evaluation two months later in December 2002. It was the worst evaluation plaintiff received. Oliver wrote:

> Tim can be a very good employee. He needs to understand that he can't always do things his way. He must follow policy and support decisions made by the staff. He has not been a complete team player this past year and before. We have given him every opportunity to change. It is now his choice to improve or settle for less.

(Exh. 15 to defendant's memo.). Timmerman wrote:

> This is a very poor performance appraisal of an employee that was on a six month probationary period less that a year ago – I concur with this evaluation of Tim Ward. Tim has not made the effort that he should have. He also has a lot of trouble carrying out dept. policy. Is not a good employee.

(Exh. 15 to defendant's memo.)

Per defendant's policy, plaintiff requested an opportunity to respond to this performance review. Plaintiff then prepared a response challenging the findings in the evaluation report but Timmerman and Oliver told plaintiff Smith would not accept it. Oliver advised plaintiff that the responses he gave were insufficient. Oliver then prepared a statement for plaintiff which plaintiff initially refused to sign. Plaintiff asserts he felt he was forced to sign the prepared statement, but, after reviewing it, he signed the final version. Plaintiff testified that most of the response is incorrect, except:

> Q: The second sentence, ["]I fully realize that I have made mistakes that could have and almost did cause my dismissal["]; is that true or untrue?

-4-

A: that is true.

(Plaint. Dep. at 98, Exh. 17 to defendant's memo.).  Oliver testified at the Employment Security

Commission as follows:

> [Oliver]: And I also want to say this letter that Tim wrote to, he gave me a copy of the letter that he was going to give to John Smith and Mr. Timmerman said that wasn't good enough.  So I typed the letter for Tim myself, and I typed exactly what he was suppose to say in the letter.  So in essence that really wasn't his words, and again maybe that's something I shouldn't have done.

(Transcript at 74-75).  Plaintiff was again placed on probation for a period of six months.

In May 2003, Oliver's employment with the defendant ended.  The defendant conducted an

internal investigation, which ultimately led to grand jury indictments against Oliver.

With Oliver gone, plaintiff began to assume some of Oliver's duties.  Shortly thereafter, an

issue arose over plaintiff's approval of the defendant's hosting of another recreation department's

baseball tournament in addition to the one it was already hosting.  Plaintiff did not seek prior

approval.  Timmerman "didn't think [defendant] needed to be spending money on somebody else's

tournament."  Plaintiff did not believe he needed prior approval.

In early June, another issue arose regarding the premature cancellation of the Dixie Youth

Baseball season.  Timmerman testified that "two coaches called [him] raising the dickens, and called

the mayor and called the city manager wanting to know why the season had been discontinued. . .

."  (Transcript at p.7 ).  Plaintiff claims Timmerman knew of, and participated in, the decision.[3]

---

[3]  Plaintiff presents the testimony of Oliver at the Employment Security Commission hearing in which, he argues, Oliver testified cancellation of the season was not plaintiff's fault.  A review of the testimony does not fully support plaintiff's position.  Mr. Oliver testified that it was anticipated that the season could be cut short because of competing interest in field availability, but that he was unaware of what transpired after his employment was terminated. (Transcript at 66-67)

(Transcript at 42).

Also in early June, an issue arose regarding damage to one of defendant's baseball fields. Play had been cancelled for the day due to rain. The fields were nonetheless used and suffered extensive damage. Plaintiff does not dispute that the fields were damaged. Plaintiff was the highest ranking person at the recreation department present at the time. (Plaint. Dep. at 112). Without plaintiff's knowledge, a coach, who was defendant's Public Safety Officer, took his team on the field and practiced anyway. (Transcript at 142-44). Timmerman testified it was plaintiff's responsibility to check the fields. (Transcript at 11, 22).

Another incident arose in mid-June regarding plaintiff's working overtime hours without approval. City policy requires prior approval before overtime is worked. Plaintiff admits he did not always comply with the overtime policy because he was told to do what was needed to get the job done. After Oliver's employment was terminated, Timmerman told plaintiff he had "overtime available" if plaintiff needed to work extra hours to get the job done. Plaintiff never asked Timmerman if this meant he could work overtime without prior approval. Instead, he worked 19 hours of overtime in his last week of employment without prior approval. Timmerman considered this a violation of policy.

On June 16, 2003, Timmerman suspended plaintiff for two weeks while he and City Manager Smith weighed plaintiff's future with the defendant. Plaintiff issued a rebuttal to Timmerman's suspension memorandum, which he gave to Smith. On July 1, 2003, plaintiff's employment was terminated.

Following his termination, plaintiff filed a grievance with the defendant. The grievance committee agreed with plaintiff and supported his reinstatement. Smith rejected plaintiff's grievance

-6-

and upheld Timmerman's decision to terminate plaintiff.

The memorandum from Timmerman to plaintiff dated June 16, 2006, reads as follows:

A number of things have happened last week that have led me to the determination that you employment with the City of North Myrtle Beach should be decided in 2 weeks. A sampling of these facts is:

1 – You continue to put unauthorized overtime hours on your time card. I have told you time and again that I must approve this in advance.

2 – On Wednesday we had a thunderstorm at 2:00 pm, Jim Grainger and his crew worked on the fields until 4:00 pm and decided they were to wet to be played on safely. He called and told me of that decision. I told you not to play or practice on the fields. Not only did you allow play and practice you told people that it was a bad decision. You have been told this is Jim's call and we back the decision. You should have not allowed children on these fields – they could get hurt.

3 – After Joe Lategano and I decided to complete the Dixie Boys baseball season and had told the coaches and parents that we were going to do so, you discontinued that season. That was a decision you should have never made on your own and it caused a whole week of anger and confusion for me from parents and coaches of these children. I was caught totally off-guard and defenseless. Suffice it to say, this was a terrible decision.

4 – I also find out from other sources, not you , that we are hosting a tournament that I don't know about and have another team in a tournament without any knowledge of this. I'm telling people that are asking me that this isn't true only to find out from you that it is.

Any of the above facts would be sufficient by themselves for disciplinary action, and as you know you are currently on probation. They violate multiple rules of personnel policy and taken together they represent a flagrant violation of trust as a City employee, and leave me no choice other than to suspend you for two weeks without pay and at that time your future with the City will be determined.[4]

---

[4] The suspension was approved by City Manager Smith.

Plaintiff reply to Timmerman's memorandum reads as follows:

I find it necessary to answer to several allegations of poor decision making concerning myself and events taken place at the North Myrtle Beach Recreation Department. These accusations were brought to my attention by Dick Timmerman on the above date.

1.  Unauthorized overtime – For the past several years I have been an active participant in the Hershey Track Meet held at Coastal Carolina University. Mr. Timmerman is well aware of this and was aware of the event on Saturday, June 7, 2003. He did not at anytime inform me not to work with our youth track team this year.

2.  On Wednesday June 11, 2003 a thunderstorm occurred which forced the department to cancel all games. The information of the cancelled games were placed on all of the voice mail systems including mine just as it has been done in the past. If a team decided to practice on the fields in spite of the decision made by the department then it was a decision made by the individual coaches. Mr. Timmerman also chose to follow up a statement by "people" indicating that I stated that this was a bad decision. This is totally untrue and I would be willing to speak to any individual who would witness my making such statement.

3.  I, Tim Ward, did not make any decision to discontinue the Dixie Boys baseball season. Upon the coaches meeting on Friday June 6, 2003 to choose the all-star team members, the coaches agreed to continue to try to fill the roster for the Monday scheduled games on field 1. They also agreed that each head coach would notify the all-stars selected from each team. After playing Monday's games, coach Don Wiggins spoke with the other coaches and informed Mr. Timmerman and myself that there would not be enough players to play Wednesday's game. On Tuesday June 10, 2003, I spoke with the district director, Billy Hendricks, to discuss possible violations, according to the rule book, made by games being played after the selection of all-stars have been made. I, then found it necessary to call a coaches meeting to inform them of possible league violations. Mr. Wiggins informed us at the meeting that he did contact the all-stars selected during the local league play, which is a violation. Mr. Timmerman was present at this particular meeting and was aware of the above actions and the fact that I did not discontinue the season.

4.      North Myrtle Beach was selected for the host site for the Dixie Boys tournament in May, 2003 after a bid by the former athletic director, Eddie Oliver.  Mr. Oliver and Mr. Timmerman have worked very close together in this recreation department until his recent dismissal. Due to the absence of an athletic director at this time, I responded to the request of Waccamaw recreation located on Hwy. 90, to play 2 teams in the district that we are already scheduled to host.  This decision did not violate any rules or regulations in the league and I did not find it necessary to confer with Mr. Timmerman about a minor athletic department decision.

Nothing that I have done in the above accusations by Mr. Timmerman violates personnel policy and/or procedures.  I therefore challenge the decision of employment suspension without pay that he has taken prior to gathering factual information.  I am willing to meet with you as soon as possible to discuss the situation.  Your attention to this matter will be greatly appreciated.

City Manager Smithson[5] responded by memorandum dated August 15, 2003, as follows:

After a review of the grievance hearing tape recording and review of the Committee's recommendation, as well as review of other information concerning your tenure with the City, I make the following findings:

1.      Unauthorized Use of Overtime: I understand that you and the department were under a lot of stress in dealing with the workload due to another employee's dismissal.  However, I expect you and all employees to keep your supervisor informed of work demands, especially overtime.  It does not appear that you made any attempt to get approval to work overtime.  The fact that the Director approved the timesheet for payment is irrelevant.  By law, the City must pay employees for all hours worked, even if not authorized.  Your mistake was in failing to get authorization.  The Committee failed to address this issue.

2.      Unauthorized Use of Playing Fields.  After Jim Grainger called off the use of playing fields for games and practice due to the wet conditions, you permitted several persons to use the field.  You contended at the hearing that you felt intimidated

_____

[5] Apparently, Mr. Smithson became the City Manager around the time plaintiff was suspended.

by one of the individual's (the Director of Public Safety) insistence that he use the field. Even so, the correct procedure would have been to contact your Director for guidance. You did not even try to call him.

You also argued, and the Committee agreed, that you were under no obligation to police the fields after your regular work hours. I disagree. When you see people violating the established rules, whether you are on duty or not, you are obligated either to handle the situation or if unable to do so, to contact the appropriate person.

3.    <u>Dixie Boys Baseball Season</u>.   I agree that the testimony regarding this issue was confusing. However, the real issue is your failure to consult with the Director after he and Joe Lategano told parents the season would be completed. Calling a coaches' meeting about such a serious issue without consulting the Director was, at the least, bad judgment.

4.    <u>Your Child at City Facilities</u>. I agree with the Committee that you have a right to enroll your child in the City's recreation programs. However, your children's participation is not the issue. The issue is your decision to take your children with you to meetings at another location during work hours. This is another example of your bad judgment.

Additional matters not addressed by the Committee:

5.    <u>Tournament</u>.  Your decision to involve the City in hosting another tournament was not your decision to make. At a minimum, you should have discussed this matter with the Director before promising the use of City resources.

6.    <u>December Evaluation</u>.  Regardless of any considerations for the workload, you were on probation for your last evaluation. After your December evaluation, former City manager John Smith asked you to respond to the deficiencies addressed in the evaluation. You signed a letter stating you would be a team player and would keep your supervisors informed of your activities. You understood that failure to improve could result in dismissal. The letter was made part of your file. At your hearing, you stated you were "forced" to sign the letter by your supervisor. However, you never brought this issue to

-10-

the City Manager's attention and in any event, this allegation does not change the fact that you were on notice you had to improve.

7    <u>Timing of Discipline</u>.  You stated at the hearing that Mr. Timmerman did not begin disciplining you until you applied to be Athletic Director.  I do not understand the significance of this statement; particularly since you do not contest the underlying facts, which gave rise to your discipline.  And, it is true that City manager John Smith did indicate to me and to the Director that no decisions would be made on any personnel, position vacancies or other issues until the new city manager was appointed.

<u>Conclusion</u>

You did not contest the actual facts, which led to your discharge. Rather, you simply tried to make excuses for your actions and inactions. Despite counseling sessions and warnings, you continued to take matters into your own hands rather than consulting with the Director.

For the reasons set out above, I reject the Grievance Committee's recommendation that you be re-instated and uphold your discharge.

### *Standard of Review*

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP.  The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), FRCP; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  <u>Celotex</u>, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed.R.Civ.P. 56(e); <u>Matsushita Electrical</u>

Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

*Analysis*

There are two methods of proving a case of intentional discrimination under Title VII: the method set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (mixed-motive) and the method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(pretext).[6]  Under the mixed-motive method, a plaintiff must present sufficient evidence, direct[7] or circumstantial, that, despite the existence of legitimate, nondiscriminatory reasons for the adverse employment action, an illegal factor (i.e., race) was a motivating factor in the decision.  Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277, 284-86 (4th Cir. 2004).  Plaintiff need not show race was the sole motivating factor but only that it was a motivating factor.  Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).  The racial bias must come from a relevant decisionmaker.[8]  Also, the protected trait "must have actually played a role in the employer's decision making process and had a determinative influence on the outcome."  Hill, 354 F.3d at 286.

Regardless of the method of analysis employed, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."  Hill, 354 F.3d at 286.  Plaintiff must produce sufficient evidence upon which a reasonable juror could find that the protected trait actually motivated the

---

[6]   Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277 (4th Cir. 2004).

[7]   Direct evidence "is evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision."  Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).  It is evidence that by itself, proves the existence of a fact without inferences or presumptions.  Thomas v. Savannah River Co., 21 F.Supp.2d 551, 560 (D.S.C. 1997)(internal citation omitted).

[8]   See Hill, 354 F.3d at 291 ("an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision.").

employer's decision.  <u>Id</u>.

At the Employment Security Commission hearing, Oliver testified as follows:

Hearing Officer: In the file and that's the only reason I'm asking you this question, did race play any part in that evaluation, in his getting a low evaluation?

[Oliver]: I think that it could have.  Now I'm not going to say who's racially biased, but I did see a lot of things that were, Tim made some great efforts to get blacks involved at North Myrtle Beach.  Normally they wouldn't have been involved, but particularly in basketball and football, Tim went out on his own to get the blacks involved in the programs.  That created a lot of controversy, and I again I don't really want to get into those areas of things, but I do know he caught hell about too many blacks playing in certain programs.  In fact the last year I was there, we eliminated the older program completely because that's where most of the blacks played.  And. . . .

Hearing Officer: Were you ever told by anybody in the supervisory authority in the city that the recreation program in North Myrtle Beach was a "white" program?

[Oliver]: The only comment I can remember is that "this is a white community and they're not going to stand for that kind of stuff."  And that's when there were predominately blacks in the league.

(Transcript at 75-76).

Defendant challenges this testimony as inadmissible and asserts the court should not consider it for purposes of summary judgment.  Oliver, who was not an employee of defendant at the time of this testimony, states he is not going to identify who is "racially biased" and does not identify the speaker of the statement about it being a white community and were "not going to stand for that kind of stuff."  He does not identify his or her department, job, or other identifying factor.  He also does not identify from whom plaintiff "caught hell."  It could have been the players, the coaches, the community, or it could have been the relevant decisionmakers.  The evidence only provides an opportunity to speculate from whom he "caught hell."  The same problem arises regarding the

-14-

statement about who is racially biased, "things" he observed to be racially biased, and the one comment he could recall. Oliver does testify that plaintiff exerted great effort in obtaining participation from African-Americans in the athletic programs and that one of the programs in which most of the African-Americans participated was eliminated. However, he states that "we" eliminated the program. No evidence is presented to clarify who is included in "we." While all reasonable inferences are to be drawn in favor of plaintiff, the evidence presented does not allow the result sought by plaintiff. One would have to conclude that the relevant decisionmaker knew plaintiff exerted the effort to include African-Americans; that they were the ones that gave him hell, supported such conduct or at least agreed with it; that they were aware that African-Americans mostly played in the program that was eliminated, and were involved in, acquiesced in, or supported the decision to eliminate the program. Furthermore, one would have to infer that the relevant decisionmakers wanted to terminate plaintiff's employment because of, at least in part, the above. To reach the conclusion advanced by plaintiff based on the proper evidence submitted would require inference upon inference that amounts to speculation.

Plaintiff fails to show that any of the testimony is an admission of a party opponent. The testimony contains hearsay, speculation and conclusory statements. Furthermore, the testimony provides no foundation for it to be attributable to the defendant. The evidence, direct or circumstantial, presented is insufficient to show plaintiff's race was a factor in the decision to terminate his employment.

Lacking sufficient evidence under the mixed-motive analysis[9], plaintiff may proceed under

_____

[9] At the hearing held August 9, 2006, the parties agreed that this case is properly analyzed under the McDonnell Douglas method.

the pretext analysis. Under the McDonnell Douglas[10] analysis, plaintiff has the initial burden of demonstrating a *prima facie* case of discrimination. To establish a *prima facie* case, plaintiff must show (1) he is a member of a protected class; (2) he was qualified for his job and he was performing his job at a level that met his employer's reasonable expectations; (3) he suffered an adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. Hill v. Lockheed Martin Logistics Mgmt, 354 F.3d 277, 285 (4th Cir. 2004). Under some circumstances, the fourth element can be established by presenting evidence raising an inference of discrimination. See Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir. 2005); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001)(citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)). In a disparate discipline case, the fourth prong may be satisfied by establishing that other employees who are not members of the protected class were retained under apparently similar circumstances. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002).[11]

Plaintiff satisfies the first and third prongs of the analysis. However, defendant challenges plaintiff's showing on the second and fourth prongs.

Defendant asserts that plaintiff cannot prove that his job performance was meeting its reasonable expectations. As set forth by defendant, plaintiff was placed on probation for six months

---

[10] The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993), and Reeves v. Sanderson Plumbing Products, Inc., – U.S. –, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[11] The Fourth Circuit recently discussed the necessity of the standard fourth element. Miles v. Dell, Inc., 429 F.3d 480, 485-90 (4th Cir. 2005). Although *Bryant* was not discussed in *Miles*, *Bryant* remains valid law. See Powell v. Bank of America, N.A., 2005 WL 2335463, n. 4 (W.D.N.C. 2005)(discussing state of law prior to *Miles*).

in June 2001 which involved an admitted improper use of his cell phone.  Then, in October 2002, he was reprimanded for failing to follow the directive of his supervisor.  While the underlying reason as alleged by plaintiff is disturbing, he did not communicate the reason to Timmerman.

In January 2003, six months before the termination of his employment, he was placed on probation as a result of the poor performance evaluation.  While there is evidence that the extent of the poor evaluation was not legitimate, the evidence shows only Oliver knew this.  There is no basis for attributing this knowledge to Timmerman or Smith; that Timmerman or Smith were aware of Oliver's wrongful conduct prior to the termination of plaintiff's employment.

Within the two-month time frame of the termination of his employment and while on probation, he approved the hosting of another recreation department's baseball tournament in addition to the one defendant was already hosting; the Dixie Youth Baseball season was prematurely cancelled; the baseball field was severely damaged; and he submitted overtime hours that had not been approved.

Plaintiff counters defendant's argument with the testimony of Oliver at the Employment Security Commission hearing.  Specifically, plaintiff asserts that Oliver testified that he was forced to give the plaintiff a poor evaluation in December 2002.

Oliver testified as follows:

> Claimant Witness: The thing that I'm ashamed about is is (sic) the poor evaluation Tim.  He worked for me for five years.  I gave him a poor evaluation and I should not have done that, not to the degree that I did it, and I'm ashamed of that.  For five years every year I gave him an evaluation I gave him what I thought was a good evaluation.  I'm not gonna . . . .
>
> Hearing Officer: Why did you give him . . . .
>
> Claimant Witness: . . . blame anybody for it.  I felt pressured.  But I'm not

-17-

blaming anybody for that. I'll take responsibility for doing a stupid thing, which I did, a very stupid thing. I might've graded him low in some areas, but I went far beyond what I should've done, and I am totally ashamed of that. In 40 years, in 32 years in recreation I've never fired anybody. I never wanted to fire anybody. I feel like if there's a way that you can save their family and their entire life. So I, under no circumstances would I have ever fired Tim because he was too valuable to me. He knew things that I didn't know. I mean I was kind of new in the area. He k new everybody. The kids loved him. I would never have gotten rid of a guy like that. I gave him the poor evaluation which caused some of his problems now, but that's my fault; that not his fault, and I'm sorry for that, Tim. Again I apologize.

Hearing Officer: What kind of evaluation should he have gotten?

Claimant Witness: He should've gotten better than average.

Hearing Officer: Why did you give him the bad evaluation?

Claimant Witness: Do I have to get into that? I don't want to get into that.

Hearing Officer: Was it justified?

Claimant Witness: No.

Hearing Officer: Did he deserve it?

Claimant Witness: No.

(Transcript at p. 73-74).

Oliver's testimony, in the light most favorable to the plaintiff, indicates that he should not have given plaintiff an evaluation as bad as he did. However, to the extent plaintiff argues that Oliver was pressured by defendant to submit the poor evaluation, the testimony simply does not support his position. To infer he was pressured by his supervisor; specifically, the relevant decisionmakers would be speculation. Additionally, Oliver was not employed by defendant during the more recent events involving plaintiff's employment performance and plaintiff does not address them in his brief as to the second prong of the *prima facie* case. Nonetheless, while an issue of fact

-18-

may exist as to whether or not the extent of the poor performance evaluation was justified, Oliver testified that he "might've graded him low in some areas." Additionally, this only creates an issue of fact as to Oliver's evaluation and not as to Timmerman's evaluation or the remainder of the circumstances present at the time plaintiff's employment was terminated. It is the perception of the defendant that is important. There may be an issue of fact as to whether or not it was fair to hold plaintiff responsible for some of the problems encountered in 2003 which lead to his final suspension. Plaintiff may disagree as to his authority regarding the hosting of another department's baseball tournament, the necessity of specific prior approval of overtime hours, and his responsibility of keeping the fields empty when play had been cancelled. However, defendant's perception at the time of termination was plaintiff was not meeting their reasonable expectations considering plaintiff's past performance.[12]

Assuming plaintiff can establish prong two, he fails to establish prong four. Prong four requires that he establish that other employees who are not members of the protected class were retained under apparently similar circumstances. Plaintiff asserts that a white employee, Doris McAlister, was allowed to work over time.

Plaintiff fails to establish that Ms. McAlister worked unapproved overtime and that she was not punished for it. It appears from his deposition transcript submitted by defendant that the record basis for his position is his "personal opinion." (*See* Transcript at 121). This is insufficient to defeat defendant's motion.

Additionally, plaintiff must establish that "other employees" were similarly situated in all

_____

[12] It is noted that a factual dispute exists as to whether or not Timmerman was aware of, and participated in, the decision to cancel the Dixie Youth baseball games. This is not enough to present an issue of material fact as to the second prong.

-19-

relevant respects; that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F2d 577, 583 (6th Cir. 1992)(citing Mazzella v. RCA Global Communications, Inc., 642 F.Supp. 1531 (S.D.N.Y.1986), aff'd, 814 F.2d 653 (2d Cir.1987); Linear v. Safeway Grocery, 843 F.2d 298 (8th Cir.1988) (plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his own); Cox v. Electronic Data Systems Corp., 751 F.Supp. 680 (E.D.Mich.1990)); Radue v. Kimberly-Clark Corp., 219 F3d 612,617-18 (7th Cir. 2000)(holding that plaintiff must demonstrate that the same supervisor was involved in comparable situations to demonstrate disparate treatment of similarly situated employees); Stanback v. Best Diversified Products, Inc., 180 F.3d 903,910 (8th Cir. 1999)(same); Shumway v. United Parcel Serv., Inc., 188 F.3d 60,64(2d Cir. 1997)(employees were not similarly situated because they were not supervised by the same person).[13]   Plaintiff fails to present evidence showing he was similar, for these purposes, to Ms. McAlister. Therefore, plaintiff fails to establish the fourth prong of the *prima facie* case.

Assuming a *prima facie* case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the termination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 ((1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).   Once the defendant has met its burden of production

---

[13]  There is no published Fourth Circuit case on point; however, the Fourth Circuit has cited with approval the precedent in this string cite in the unpublished cases of Flateau v. South Carolina Commission for the Blind, 2002 WL 31553805 (4th Cir. 2002); Heyward v. Monroe, 1998 WL 841494 (4th Cir. 1998); Edwards v. Newport News Shipbuilding and Dry Dock Co., 1998 WL 841567 (4th Cir. 1998).

by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non*." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by the defendant is not its true reasons, but were pretext for discrimination. Reeves, 530 U.S. at 143. During all of the burden shifting scheme set forth in McDonald Douglas, the ultimate burden of proving that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Defendant proffers its legitimate, nondiscriminatory reason for termination: poor performance. Plaintiff was placed on probation on two occasions. While on probation for the second time, the incidents involving the damaged baseball field, the unapproved overtime, the hosting of another recreation department's baseball tournament, and he brought his child to work and took him with him on a work-related errand to another town in a city-owned vehicle. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him based on his race. It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[14] Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir. 2000)(quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions

---

[14] "Proof that the employer's proffered reasons in unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct." Reeves, 530 U.S. at 146-47. "It is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [his] explanation of intentional race discrimination." Id.

made by firms charged with employment discrimination ...." (internal quotation marks omitted));
Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the
importance of giving an employer the latitude and autonomy to make business decisions, including
workplace reorganization, as long as the employer does not violate the ADEA."); Jiminez v. Mary
Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the
judgment of a court for that of the employer").  It is the perception of the employer that is critical.
Hawkins, 203 F.3d at 280.  Even a reasoned decision based on incorrect facts is not evidence of
pretext.  Pollard v. Rea Magnet Wire Co., 824 F.3d 557, 559 (7th Cir. 1987), cert. denied, 484 U.S.
977 (1987).

Plaintiff argues that pretext is apparent because he "believes he can show the city fired him
so the City could continue to operate in a systematic method to exclude blacks and minorities from
it's youth athletic programs.  The only evidence presented is Oliver's testimony which is discussed
in detail above.  Again, even if Oliver's testimony is true, plaintiff fails to link the evidence with the
adverse employment decision.

Employers are not vicariously liable for the discriminatory acts and motivations of each
person that they employ, even when such acts or motivations lead to or influenced an adverse
employment action.  Rather, by defining "employer" to include "any agent" of the employer,
Congress "evidence[d] an intent to place some limits on the acts of employees for which employers
. . . are to be held responsible."  Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277, 287
(4th Cir. 2004) ("an employer will be liable not for the improperly motivated person who merely
influences the decision, but for the person who in reality makes the decision.").  When a formal
decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation

actually made by a subordinate[15], it is not inconsistent to say that the subordinate is the actual

decisionmaker or the one principally responsible for the contested employment decision, so long as

he otherwise falls within the parameters of the discrimination statute's definition of employer or

agent of the employer." Id. at 290-91 (employer not liable for biased subordinate who does not

possess supervisory or disciplinary authority and who does not make the final or formal decision

even if biased subordinate has substantial influence on the ultimate decision or played a role, even

a significant role, in the decision). An employer will be liable not for the improperly motivated

person who merely influences the decision, but for the person who in reality makes the decision. Id.

at 291. The determination should be made based on the facts as they appeared to the decisionmaker

at the time. Id. at 293.

The only evidence presented is the testimony given at the Employment Security Commission

hearing and the deposition of plaintiff. Oliver, or others, may have specific information linking the

adverse employment decision for purposes of plaintiff's claim. Clearly, there was racially improper

actions on the part of Oliver involved with the reprimand for failing to follow directives. Also, in

the light most favorable to plaintiff someone did not approve of plaintiff encouraging the degree of

participation from African-Americans in the athletic programs. This evidence is disturbing.

However, the necessary details simply are not contained in the record. Oliver's evasive testimony

certainly leads one to wonder: who, what, where, when and why. Speculation can certainly lead to

results that are appalling. However, speculation is insufficient under Rule 56 to defeat summary

---

[15] To qualify as a supervisor for purposes of Title VII one has to be in a position to "exercise significant control over the plaintiff's hiring, firing or conditions of employment." Paroline v. Unisys Corp., 879 F.2d 100, 104 (4th Cir. 1989). Having the power to have "significant input into such personnel decisions" or the "power to determine work assignments" are factors that tend to demonstrate supervisory capacity. Id.

judgment.

At the hearing held August 9, 2006, I specifically asked whether plaintiff's Title VII claims were limited to the only claim addressed in the briefs, a wrongful discharge claim.[16]  The parties agreed in the affirmative.

Defendant also argues that, assuming all of plaintiff's allegations as true, plaintiff fails to present facts supporting a claim that plaintiff was terminated based on *his* race.  In other words, it argues that plaintiff's claim is not for termination based on *his* protected trait, but for termination based on the trait of those who he was including in the athletic programs.  Therefore, it argues, although plaintiff happens to be African-American, his termination was not based on the fact that he is African-American, but because of his support of others who were members of a protected class which happens to be African-American.

Stated differently, defendant argues that if plaintiff was white, he would not have a claim for termination as a result of discrimination against others.  A better analogy is to assume the ones he solicited to participate were of another protected class (eg, Hispanic).  It argues the same logic applies to the actual facts at issue: plaintiff happens to be the same race as those discriminated against, the African-American participants in the athletic programs, but he was not terminated because of *his* race but because of the race of the African-American participants.[17]

---

[16]  In other words, this case does not assert a Title VII claim relating to the suspensions or other claim under Title VII.

[17]  Applying this argument to the facts at issue, it is undisputed that plaintiff was hired on two occasions by Timmerman, was promoted by Timmerman on at least two occasions, and Timmerman "went to bat" for plaintiff on one or two occasions to prevent plaintiff from losing his job.  It defies logic to conclude that *plaintiff's race,* as opposed to the race of the participants, was a motivating factor in the decision to terminate his employment.

Defendant does not cite any authority for its argument except the statutory language itself. Defendant, in essence, is arguing that plaintiff lacks standing to bring this claim based on the protected rights of others. It is not clear how far an "association" claim under Title VII reaches. See Ineichen v. Ameritech, 410 F.3d 956 (7th Cir. 2005); Tetro v. Elliott Pophan Pontiac, Oldsmobile, 173 F.3d 988 (6th Cir. 1998); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581 (5th Cir. 1998); See also Fielder v. Marunsco Christian School, 631 F.2d 1144 (4th Cir. 1980)(§1981 claim). It does appear that standing under Title VII extends to the farthest reaches of Article III. See Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209, 93 S.Ct. 364, 366-67, 34 L.Ed.2d 415 (1972), citing Hackett v. McGuire Bros., Inc., 445 F.2d 442, 446 (3d Cir.1971); Kyles v. J.K.Guardian Sec. Servs., Inc., 222 F.3d 289 (7th Cir. 2000); Anjelino v. New York Times Co., 200 F.3d 73, 91 & n. 25 (3d Cir.1999); Stewart v. Hannon, 675 F.2d 846, 849 (7th Cir.1982); E.E.O.C. v. Mississippi College, 626 F.2d 477, 482-83 & n. 7 (5th Cir.1980), cert. denied, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); E.E.O.C. v. Bailey Co., 563 F.2d 439, 452-54 (6th Cir.1977), cert. denied, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978); Waters v. Heublein, Inc., 547 F.2d 466, 469-70 (9th Cir.1976), cert. denied, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977); Gray v. Greyhound Lines, East, 545 F.2d 169, 176 (D.C.Cir.1976).

Nonetheless, it not necessary to decide this issue. As discussed above, assuming plaintiff does have standing, he has failed to make out a *prima facie* case, failed to show pretext, and has failed to present evidence upon which a reasonable juror could conclude that race was the, or "a" for that matter, motivating factor in the decision to terminate his employment.[18]

---

[18] This is a fairly close case under Rule 56. However, while plaintiff is entitled to reasonable inferences, he is not entitled to reasonable speculation. The record is very thin. The hearing officer in the Transcript did not compel answers from Oliver and the record does not

### *State Law Claims*

Plaintiff presents causes of action under state law for outrage and negligence. Defendant claims these cause of action are barred by the exclusivity provision of the South Carolina Worker's Compensation Act, S.C. Code §42-1-540. It is clear under South Carolina law, the Worker's Compensation Act is the exclusive remedy for a claim of outrage (otherwise known as intentional infliction of emotional stress). See McLain v. Pactiv Corp., 602 S.E.2d 87, 89 (S.C. App. 2004).[19] Also, as argued by the defendant, the South Carolina Tort Claims Act excludes the intentional infliction of emotional harm from the definition of "loss" for which a government may be liable under the Tort Claims Act. See §§ 15-78-30(f) and 15-78-60(17).

Plaintiff appears to argue that the exclusivity of the Worker's Compensation Act and the exclusion found in the Tort Claims Act do not apply based on public policy grounds. However, plaintiff fails to cite any authority for his position.

Plaintiff fails to validly contest defendant's positions and defendant's motion for summary judgment on plaintiff's state law claims for negligence and outrage should be granted. However, if the district judge does not agree, and assuming plaintiff's Title VII claim is dismissed, plaintiff's state law claims should be dismissed. Specifically, this court can decline to continue the action as to the pendent claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

---

contain additional testimony from Oliver or others. As young attorneys, we are schooled to not ask a question to which we do not know the answer. This case compels one to wonder what is the answer to that one more question.

[19] As stated in McLain, an exception exists when the tortfeasors are the alter egos of the employer, circumstances not present in this case.

For the foregoing reasons, it is recommended that defendant's motion for summary judgment (Document # 11) be granted in its entirety as set forth above.  However, if the district judge agrees that the federal claims should be dismissed but the state law claims should not be dismissed, it is recommended that jurisdiction of his state law claims be declined.

August 16, 2006                                      s/Thomas E. Rogers, III_____
Florence, South Carolina                      Thomas E. Rogers, III
                                                           United States Magistrate Judge

**The parties' attention is directed to the important notice contained on the following page(s).**

# Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"
### &
## The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina  29503
